*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-0330**

State of Minnesota,
Respondent,

vs.

Tylynne Lashawn Wilson,
Appellant.

**Filed March 17, 2025**
**Affirmed**
**Reyes, Judge**

Hennepin County District Court
File No. 27-CR-22-20621

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Britta Nicholson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Frisch, Chief Judge; and Reyes, Judge.

**NONPRECEDENTIAL OPINION**

**REYES**, Judge

Appellant argues that (1) the state presented insufficient evidence at trial to support his conviction of attempted first-degree murder because the circumstances proved allowed for the reasonable inference that he only intended to cause the victim great bodily harm

and (2) the district court abused its discretion by imposing the attempted first-degree-murder sentence consecutive to the sentences for first-degree burglary and unlawful possession of a firearm. We affirm.

**FACTS**

Appellant Tylynne Lashawn Wilson and BH began dating in May 2019. They share a daughter together, KW, who was born in March 2021. BH has two other children who were not fathered by appellant. Appellant and BH's relationship became increasingly tumultuous and abusive leading up to the charged conduct, which occurred on October 10, 2022.

On that date, appellant called KW, who was with BH at BH's mother's house where they were then living, on her tablet. Appellant told BH, who was present during the call, that he knew where she planned to move, BH made fun of him for recently being robbed, and the call ended. A few minutes later, BH heard someone trying to get into the house and called 911. While BH was still on the 911 call, appellant, wearing a cloth tied around his face, came upstairs and entered the bedroom where she and their daughter were. Appellant shot BH at least ten times until he ran out of bullets, shooting her in and below the abdomen. Appellant then took BH's phone, said "b-tch I'll kill you b-tch," asked for and took their daughter's tablet so that BH could not call for help, and left. BH had severe injuries from the shooting.

Respondent State of Minnesota charged appellant with attempted first-degree murder, attempted second-degree murder, first-degree burglary—assault, stalking, and unlawful possession of a firearm. Following a trial, a jury found appellant guilty of all of

2

the offenses and found five aggravating factors: (1) appellant shot BH in the presence of a child; (2) a child was present during at least two stalking incidents;[1] (3) BH was in her home at the time of the shooting; (4) appellant shot BH at least ten times; and (5) appellant took BH's phone after the shooting.

The district court dismissed the attempted second-degree-murder conviction as a lesser-included offense of attempted first-degree murder. The district court sentenced appellant to 48 months for stalking, 60 months for unlawful possession of a firearm, and 129 months for burglary, all to be served concurrently. The district court then sentenced appellant to 240 months for attempted first-degree murder, to be served consecutive to the other sentences, resulting in a combined 369-month sentence. The district court found three aggravating factors warranting an upward durational departure: (1) the presence of a child; (2) appellant committed the crime in a particularly cruel manner by shooting BH at least ten times; and (3) appellant committed the crime in a particularly cruel manner by taking BH's phone after shooting her, preventing her from communicating with emergency services. This appeal follows.

**DECISION**

I.      **The state presented sufficient evidence at trial to support appellant's conviction of attempted first-degree murder.**

Appellant argues that the state presented insufficient evidence to support his conviction of attempted first-degree murder because it allowed for the alternative

---

[1] Stalking is defined as "two or more acts within a five-year period." Minn. Stat. § 609.749, subd. 5(b) (2022).

reasonable inference that appellant only intended to cause BH great bodily harm. We are not convinced.

A person is guilty of attempted first-degree murder when they take a "substantial step toward" causing the death of another "with premeditation and with intent to effect the death of the person." Minn. Stat. §§ 609.17, subd. 1; 609.185 (a)(1) (2022). "With intent to . . . means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause the result." Minn. Stat. § 609.02, subd. 9(4) (2022) (quotations omitted). A person's intent "is inferred from words and acts of the actor both before and after the incident" and it "can be inferred from the nature and extent of the victim's wounds." *State v. Balandin*, 944 N.W.2d 204, 216 (Minn. 2020) (quotations omitted).

A fact-finder may find a person guilty by direct or circumstantial evidence. *State v. Olson*, 982 N.W.2d 491, 495 (Minn. App. 2022). Direct evidence is "based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotations omitted). In contrast, circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist" and "always requires an inferential step to prove a fact that is not required with direct evidence." *State v. Jones*, 4 N.W.3d 495, 501 (Minn. 2024) (quotations omitted). "When the direct evidence of guilt on a particular element is not alone sufficient to sustain the verdict, however, [appellate courts] apply a heightened [] standard, which we have called the circumstantial-evidence standard of review." *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017).

4

There are two steps to this standard. *See id*; *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, appellate courts identify the circumstances proved at trial. *Id.*; *see State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024). "In doing so, we winnow down the evidence presented at trial to a subset of facts that are consistent with the jury's verdict, and we disregard all evidence that is inconsistent with the verdict." *Segura*, 2 N.W.3d at 155. Second, appellate courts "identify the reasonable inferences that can be drawn from the circumstances proved when viewed as a whole and not as discrete and isolated facts," without giving deference to the jury's choice between reasonable inferences. *Id.* (quotations omitted). The circumstantial evidence is sufficient to support a conviction when "the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* (quotations omitted); *see also State v. Lehman*, 3 N.W.3d 875, 878-79 (Minn. 2024).

The circumstances proved include:

- Appellant had physically abused BH since March 2021 when he hit her in the head with a gun, choked her, and punched her.
- In January 2022, police came to their home in Maple Grove several times for "fighting."
- In February 2022, after BH locked appellant out of the house, he ran his car into the garage door, kicked in the door to the house, threw bricks at BH's car, and threw a paint can at the house, damaging the siding.
- On April 23, 2022, appellant assaulted BH in front of her children, hit and punched her, smashed her phone on the floor, and threatened to kill her. A neighbor called 911, and an officer responded.
- On August 30, 2022, appellant assaulted BH in front of her son; called her son a "f-g" and threw him into the bathroom; punched, kicked, and choked BH; hit her with a gun; and broke her finger. Appellant threatened to kill her, stating "you think I won't kill you? B-tch you keep playing with me." The assault ended when BH and her son fled

5

the home. Appellant took her phone, but BH was able to call for help using KW's tablet.

- BH requested and obtained from the district court a no-contact order against appellant on September 2, 2022. Appellant repeatedly violated this order.
- In September 2022, BH moved into her mother's house with her children.
- On October 3, 2022, appellant pulled up in a black car next to TN, the father of BH's son, who was sitting in a truck outside of BH's home. The two exchanged words, and then appellant fired approximately six shots at the truck, hitting TN multiple times in the legs. BH, who had exited TN's vehicle shortly before the incident, identified appellant as the shooter.
- On October 10, 2022, while BH and KW were at home, appellant called KW on her tablet, he and BH talked briefly, and the call ended.
- Shortly after the tablet call, BH heard someone trying to enter the house and called 911 at 10:18 a.m.
- Seconds after calling 911, appellant entered the room BH was in with KW and shot her at least ten times until he ran out of bullets, which can be heard on the recorded 911 call.
- During the shooting, BH was initially standing but fell onto the bed and tried to cover herself with her leg and arm, and begged appellant to stop. KW was screaming and crying during the shooting.
- After shooting BH, appellant said to her "b-tch I'll kill you b-tch. Where's my daughter's tablet at?"
- Appellant took BH's phone and KW's tablet and left.
- An officer responded to BH's initial 911 call. BH told him that appellant shot her and took both her phone and KW's tablet.
- The responding officer believed that BH's wounds were so severe that she would bleed out and die before she could get to the hospital.
- BH's treating surgeon testified that BH was critically injured by the shooting.
- BH's treating surgeon believed, but could not be certain, that BH was shot 12 times based on the number of gunshot wounds to her body.
- BH's treating surgeon testified that even one gunshot wound can be fatal.
- BH had severe injuries from the shooting, including 22 separate gunshot wounds to her abdomen, pelvic area, and legs, injuring her small intestine, rectum, bladder, and uterus. BH also had a broken tailbone and shattered femur.
- As a result of her injuries, BH had a colostomy bag and catheter for months after her discharge from the hospital; she can no longer have

6

children and has ongoing problems with her bladder; she has no feeling on the top of one of her feet; and she has a rod in her leg and a plate in her hip.

The state argues, and appellant concedes, that the circumstances proved support a "reasonable [] infer[ence that] [a]ppellant intended to kill [BH]." We agree. When looking at all of the circumstances proved, including appellant's escalating assaults of BH before the October 10 shooting; his threats to kill BH before the October 10 shooting and after shooting her; his actions on October 10; and the serious injuries BH sustained as a result of the shooting, the only reasonable inference is that appellant intended to kill BH, but failed to do so.

However, appellant makes several arguments that the circumstances proved allow for the alternative hypothesis that he only intended to cause BH great bodily harm.

First, appellant cites the size of the bedroom where he shot BH, his proficiency with a gun, that he shot her at near-point-blank range, and that he "altogether avoid[ed]" shooting BH in the "chest, heart, neck, head, or other vital organs." Appellant maintains that these facts all support the inference that he intended only to harm BH, not kill her. But appellant fails to point to any circumstances proved to support his claimed gun proficiency or his intent to shoot BH only in the lower part of her body. Additionally, appellant ignores the circumstances proved that just one gunshot can be fatal, that BH tried to cover herself during the shooting with her leg and arm, and that he shot her at least ten times in the abdomen, pelvic region, and legs.

Second, appellant argues that his conversation with BH after shooting her shows his intent to harm, but not kill her. Appellant first threatened to kill BH and then asked her to

7

tell him where their daughter's tablet was after having taken BH's cell phone. The only reasonable inference is that he wanted to deprive her of any way to call for help and left her to die.

Third, appellant argues that his post-shooting statement "b-tch I'll kill you b-tch," was an empty threat because he made previous similar threats without following through with them. Appellant's argument ignores the circumstances proved that his physical violence towards BH had only escalated, including shooting TN in front of her and ultimately shooting her at least ten times; that he was unable to follow through with previous threats because BH was able to flee or call for help; and that he was unable to shoot BH further to bring about her certain death only because he ran out of bullets. Appellant's increasingly violent actions toward BH show his intent to kill her.

Fourth, appellant argues that his post-shooting threat to kill BH, which uses the future tense, demonstrates that he did not actually intend to kill BH on October 10. But this argument takes appellant's words out of context and ignores the circumstances proved that he had just shot BH ten times, made that "future" threat, and then followed through by depriving her of any means of calling for help. Appellant did not ask BH if she was okay, if she needed help, and he did not offer her aid. *See State v. Ulrich*, 3 N.W.3d 1, 12 (Minn. 2024); *Balandin*, 944 N.W.2d at 216. Appellant's threat to kill BH is direct evidence of his intent to kill her. *See State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) (witness testimony is direct evidence "when it reflects a witness's personal observations and allows the jury to find the defendant guilty without having to draw any inferences").

8

Finally, appellant argues that his prior shooting of TN showed that he "knew how to cause someone to suffer severe injury without killing them" by only shooting TN, and later BH, in the "lower half of the body." The circumstances proved do not support this inference. First, appellant was in a car when he shot at TN, who was sitting in a truck, and no circumstances proved support appellant's argument or inference that he specifically intended to shoot TN in the legs. Second, in addition to shooting BH in the legs, appellant shot her in the abdomen and pelvic region. BH was critically injured and even just one of the gunshots could have killed her. The manner in which appellant shot BH shows his intent to kill her. *See State v. Fardan*, 773 N.W.2d 303, 322 (Minn. 2009) (holding that appellant's close-range shooting of victim in the abdomen, "a vital part of the body," then leaving victim "lying on the ground, still alive and bleeding" was sufficient evidence to support intentional felony murder conviction).

In addition to appellant's actions, which required the jury to make an inferential step regarding his intent, his threats to kill BH are direct evidence of his intent to do so. The circumstances proved, when viewed as a whole, including appellant's direct statements to BH, support the inference that he intended to kill BH and are inconsistent with any reasonable hypothesis other than guilt.

**II.     The district court did not abuse its discretion by imposing appellant's sentence for attempted first-degree murder consecutive to his other convictions.**

Appellant argues that the district court abused its discretion when it ordered him to serve his attempted first-degree-murder sentence consecutive to his sentences for first-degree burglary and unlawful possession of a firearm for two reasons. First, it constituted

9

both an aggravated durational departure and a departure with respect to consecutive sentences, and the district court did not find severe aggravating factors to support multiple departures. Second, both the firearm possession and burglary were incidental to the attempted first-degree murder and therefore consecutive sentencing exaggerated the criminality of his conduct. We disagree.

**A.** **The district court properly exercised its discretion by imposing consecutive sentences.**

"Generally, when an offender is convicted of multiple current offenses . . . concurrent sentencing is presumptive." Minn. Sent'g Guidelines 2.F (2022). Consecutive sentencing is permissive under the Minnesota Sentencing Guidelines if "the offender is being sentenced for multiple current felony convictions for crimes on the list of offenses eligible for permissive consecutive sentences in section 6." 2.F.2(a)(1)(ii) (2022). Crimes eligible for permissive consecutive sentences in section 6 include attempted first-degree murder, first-degree burglary with assault, and stalking. Minn. Sent'g Guidelines 6 (2022). Unlawful possession of a firearm is not listed in section 6.

Here, the district court had discretion to impose a permissive consecutive sentence on appellant's convictions of first-degree attempted murder and first-degree burglary— assault. *Id*. In support of an upward durational departure, the district court cited the presence of a child and that the crime was committed in a particularly cruel manner by shooting BH at least ten times in the abdomen and by taking her phone. Minn. Sent'g Guidelines 2.D.3(b)(2), (13) (2022); *see* Minn. Sent'g Guidelines 2.F.204 (2022); *State v. Profit*, 323 N.W.2d 34, 36 (Minn. 1982) (acknowledging that committing crime in presence

10

of child is valid aggravating factor); *Dillon v. State*, 781 N.W.2d 588, 599-603 (Minn. App. 2010) (concluding that district court did not abuse its discretion in finding aggravating factor of particular cruelty based on "the serious and permanent injuries [appellant] inflicted"). We discern no abuse of discretion by the district court's decision to impose consecutive sentences.

**B.    The consecutive sentences do not exaggerate the criminality of appellant's conduct.**

Appellate courts do not interfere with a district court's discretion to sentence unless the sentence is disproportionate to the offense or "unfairly exaggerates the criminality of the defendant[']s conduct." *State v. Fardan*, 773 N.W.2d at 322 (quotations omitted); *State v. Daniels*, 765 N.W.2d 645, 651 (Minn. App. 2009). A sentence unfairly exaggerates the criminality of the defendant's conduct when the district court imposes multiple convictions for the same behavioral incident. *State v. Branson*, 529 N.W.2d 1, 4 (Minn. App. 1995).

Minn. Stat. § 609.035, subd. 1 (2022), provides that, subject to certain exceptions, "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them." However, a "conviction of a violation of section . . . 624.713, subdivision 1, clause (2), [unlawful possession of a firearm,] is not a bar to conviction of or punishment for any other crime committed by the defendant as part of the same conduct." *Id.* at subd. 3. Another exception carved out by section 609.035, subd. 1, is section 609.585 (2022), which provides that "a prosecution for or conviction of the crime of burglary is not a bar to conviction of or punishment for any

11

other crime committed on entering or while in the building entered." These statutory carve-outs foreclose appellant's arguments that his consecutive sentences exaggerate the criminality of his actions and that the firearm possession and burglary were incidental to the attempted first-degree murder. At sentencing, the district court appropriately imposed separate sentences for appellant's convictions of unlawful possession of a firearm, burglary, and attempted first-degree murder, even though they were part of the same behavioral incident.

**Affirmed.**